**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **DANIEL O'MALIA, on behalf of the Northwest Bank 401(k) Plan, and on behalf of all similarly situated participants and beneficiaries of the plan,**<br><br>**Plaintiff,**<br><br>v.<br><br>**NORTHWEST BANK; JOHN and JANE DOES 1-30 IN THEIR CAPACITIES AS FIDUCIARIES,**<br><br>**Defendants.** | **CIVIL ACTION NO.: 1:26-cv-00160**<br><br>**COMPLAINT - CLASS ACTION** |

**<u>CLASS ACTION COMPLAINT</u>**

1. Plaintiff Daniel O'Malia ("Plaintiff"), individually, and on behalf of all other similarly situated participants, their beneficiaries and estates, and on behalf of Northwest Bank 401(k) Plan (the "Plan") brings this action under 29 U.S.C. §§ 1132(a)(2) and (3) & 1109(a) against Defendants Northwest Bank (the "Company"), and John and Jane Does 1-30 in their capacities as fiduciaries (collectively, "Doe Defendants") (collectively, the Company and the Doe Defendants will be referred to as "Defendants" or "Fiduciaries"), to remedy Defendants' breaches of fiduciary duties and other violations of the Employee Retirement Income & Security Act of 1974, as amended (ERISA), U.S.C. 29 § 1001, *et seq*.

2. Defined contribution plans that are qualified as tax-deferred vehicles have become the primary form of retirement savings in the United States and, as a result, America's *de facto* retirement system. Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or underperformance of pension plan assets used to fund defined benefits, defined contribution plans

operate in a manner by which participants bear the risk of high fees and investment underperformance.

3. As fiduciaries to the Plan, at all times relevant to this Complaint, Defendants were obligated to act prudently and for the exclusive benefit of participants and beneficiaries. Defendants violated their fiduciary duty of prudence by imprudently removing the Plan's investment in the Vanguard Target Retirement Fund series (the "Vanguard TDF") and replacing that series with the American Century One Choice Fund series (the "AC TDF") from 2021 through the present. This decision was made despite the Vanguard TDF's strong long-term performance under the universally accepted Modern Portfolio Theory ("MPT") measuring, returns, risk-adjusted performance, manager performance, and cost.

4. Prior to Defendants' choice to replace the Vanguard TDF in 2021 with the AC TDF, available market data from 2017-2020 showed: (1) that the AC TDF constantly underperformed the Plan's former Vanguard TDF selection; and (2) that the AC TDF dramatically underperformed an additional three of the most prevalent and readily obtainable TDFs available on the market. Despite having easy access to this information and a fiduciary responsibility to review it, Defendants inexplicably decided to replace the Vanguard TDF with the AC TDF. In addition, Defendants ignored better available options when choosing the underperforming AC TDF.

5. Defendants' substituted AC TDF offered no advantages over their former selection; thus, Defendants could not have engaged in a prudent pecuniary process in replacing the Vanguard TDF with the AC TDF.

6. As a result of Defendants' imprudent decision to remove the Vanguard TDF and select the AC TDF instead of more prudent investment options, Plan participants earned millions of dollars less in retirement savings than they would have earned had Defendants acted prudently

and rejected this proposed switch or picked better alternatives.[1] Based on the then-available data, a prudent fiduciary could not have reasonably expected the AC TDF to outperform the Vanguard TDF in the future.

7. These facts support the inference that Defendants failed to undertake reasoned and prudent monitoring in replacing the Vanguard TDF with the AC TDF.

8. Plaintiff brings this action to obtain the relief provided under 29 U.S.C. § 1109, for losses suffered by the Plan resulting from the Defendants' fiduciary breaches described below, and for other appropriate equitable and injunctive relief under 29 U.S.C. § 1132(a)(3).

## I. JURISDICTION AND VENUE

9. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(2).

10. Venue is proper in the Western District of Pennsylvania pursuant to 29 U.S.C. § 1132(e)(2) because Defendants reside in this judicial district, the Plan is administered in this judicial district, and one or more breaches took place in this judicial district.

## II. THE PARTIES

### A. Plaintiff

11. Plaintiff is domiciled in Ohio.

12. At all relevant times, Plaintiff, by virtue of Plaintiff's employment with the Company and participation in the Plan, is or may become eligible to receive additional benefits under the Plan.

---

[1] It strains credulity that a prudent fiduciary would even consider switching from Vanguard TDF to the AC TDF given its past performance. However, one thing is clear—it could not have been driven by the investments' metric performance.

13. Thus, Plaintiff is a Plan participant as defined by ERISA § 3(7), 29 U.S.C. § 1002(7).

14. At all relevant times during the Class Period, Plaintiff was invested in the AC TDF.

15. As a result of Defendants' mismanagement of the Plan and violations of ERISA, particularly Defendants' decision to terminate the Plan's shares in the Vanguard TDF series and select the AC TDF instead, Plaintiff was subject to underperformance and suffered financial losses.

**B. Defendants**

16. The Company resides in the State of Pennsylvania, with its office located at P.O. Box 128, 100 Liberty Street, Warren, PA 16365. Upon information and belief, the Company has over 3,000 employees.

17. At all relevant times the Company was and is the named fiduciary and sponsor of the Plan per 29 U.S.C. § 1002(16)(B) and 29 U.S.C. § 1002(a); a party in interest under 29 U.S.C. § 1002(14)(C); and a Plan fiduciary under 29 U.S.C. § 1002(21)(A), to the extent that it appointed members of a committee or board and co-fiduciaries and otherwise exercised discretion over the administration or management of the Plan and/or control of Plan assets.

18. At all relevant times, Defendants John Does 1-30, as members of a committee or board, and as the governing body of the Plan Sponsor and Administrator, were parties-in-interest under ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A), and fiduciaries of the Plan under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), to the extent that they had or exercised discretionary authority respecting the administration or management of the Plan, and/or control of Plan assets.

## III. THE PLAN

19. The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A), a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34), and a qualified plan under 26 U.S.C. § 401(k).

20. The Plan was established to provide eligible employees with the opportunity to accumulate retirement savings over a long period through the sum of employee and employer contributions and associated investment earnings minus associated expenses.

21. The Plan is a defined contribution plan covering all eligible employees of the Company and participating subsidiaries. Participants of the Plan can elect to make tax-deferred contributions upon eligibility.

22. The Defendants control and manage the operation and administration of the Plan and have fiduciary responsibility for the investment of the assets of the Plan.

23. The Plan is subject to the provisions of ERISA.

24. During the Class Period,[2] the Plan managed assets ranging from $256 million to $290 million. As of the end of 2024, the Defendants managed $259,436,274 in Plan assets for over 3,425 participants.

25. Upon information and belief, in light of the large size of the Plan and the vast resources of its Fiduciaries at all times relevant to the Class Period, the Plan had access to a wide array of plan investment options and Defendants had the ability to investigate and monitor the Plan's investments.

---

[2] As used herein, "Class Period" refers to the six years prior to the filing of this complaint.

**IV. DEFENDANTS' FIDUCIARY OBLIGATIONS**

26. ERISA imposes strict fiduciary duties upon the Defendants as fiduciaries of the Plan, including the duty of prudence. These duties apply to all fiduciary acts, including the Defendants' selection and retention of investment options for the Plan.

27. ERISA's duty of prudence requires fiduciaries to discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters would use." 29 U.S.C. §1104(a)(1)(B).

28. As part of their fiduciary duty, Defendants "ha[ve] a continuing duty to monitor [Plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.* at 530. If an investment is imprudent, Defendants "must dispose of it within a reasonable time." *Id.* (citation omitted).

29. ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty.

30. In addition, 29 U.S.C. § 1105(a)(2), establishes liability for a fiduciary who enabled the breach of a co-fiduciary, even if the fiduciary does not have knowledge of the other fiduciary's breach.

31. Under 29 U.S.C. § 1132(a)(2), a plan participant is authorized to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109.

## V. BACKGROUND ON TARGET DATE FUNDS

32. In a recent report to Congress, the U.S. Government Accountability Office ("GAO") noted that Target date funds ("TDFs") are widely offered and have become the most popular investment option used by 401(k) plan participants.[3] TDFs allocate assets over time based on participants' targeted retirement dates. Plan sponsors often choose TDFs as their default investment because TDFs offer a "set it and forget it" option for participants.

33. The investment objective of a target date fund series is to provide an asset allocation strategy that changes its asset allocation over time as investors get closer to their expected retirement date. The name of each fund in a target date series typically refers to its target date, which corresponds approximately to the investor's anticipated retirement date. For example, a fund with a name like "Retirement Fund 2040" or "Target 2040" is designed for individuals who intend to retire in or near the year 2040. Target retirement years are often offered in five-year increments. The specific retirement date of a fund in a target date series is often referred to as a "vintage." For example, funds in a target date fund series for plan participants expected to retire around 2040 would typically be referred to as the 2040 vintage of that series while the fund in a target date fund series for plan participants expected to retire around 2030 would typically be referred to as the 2030 vintage target for that specific target date fund series.

34. American Century Investment Services, Inc. ("AC") is an investment management company that created and manages the AC TDF series. The Vanguard Group ("Vanguard") is an investment management company that created and manages the Vanguard TDF series. Like most target-date fund series, both AC TDF and Vanguard TDF are structured as "fund[s] of funds,"

[3] Government Accountability Office, *GAO-24-105364, 401(k) Retirement Plans – The Department of Labor Should Update Guidance on Target Date Funds* (March 2024).

which means that each vintage invests in other AC and Vanguard proprietary funds rather than individual securities. For example, each vintage in the Vanguard TDF may be invested in differing proportions of proprietary equity funds, bond funds, real estate funds, and money market funds. In other words, each vintage of the Vanguard TDF invests in a combination of proprietary Vanguard mutual funds to provide varying exposure to a mix of asset classes such as U.S. stocks (large-caps and small-caps), international stocks, U.S. bonds, international bonds, investments linked to real estate, and cash-equivalent securities. These asset classes can be further categorized generally as allocations to equities or as allocations for fixed income.

35. Each equity allocation is intended to provide exposure to a specific market segment. Typically, those segments include U.S. large-, mid- and small-capitalization companies and international (non-U.S.) developed and emerging markets. The portfolio manager's aim should be to build a portfolio that provides exposure to factors commonly tied to a stock's potential for enhanced risk-adjusted returns relative to the market.

36. Each fixed income allocation is intended to provide diversified exposure across a wide range of market sectors, including U.S. government obligations, corporate investment grade and below investment grade bonds (commonly known as "high yield bonds" or "junk bonds"), other U.S. aggregate bond sectors (including mortgage- and asset backed securities), and emerging market and international fixed income issues. The portfolio manager's aim is to provide broadly diversified fixed income exposure and construct a portfolio to enhance issuer diversification and liquidity.

37. Under ERISA, each vintage of a target date fund series is required to be consistent with the prudent investor standard which incorporates MPT.

38. Funds that employ a target-date strategy seek to achieve their objectives by rebalancing assets over time to become less focused on growth (lowering their allocation to stocks) and more focused on preservation (raising their allocation to bonds) as the fund approaches and passes the target date. The asset mix between equity and fixed income shifts dynamically over time, becoming less risky over a person's working career and into retirement. The transition from higher risk to lower risk is often referred to as the "glide path."

39. Unlike most of the equity and fixed income asset categories that comprise the underlying investments contained in TDFs for which there are often several scores of alternatives, there are far fewer TDF options. For example, in 2020, there were only a couple dozen established TDFs that had a 15-year track record. A closer look reveals that, as shown in **Figure 1** below, assets were highly concentrated in the top 5 largest TDFs, which accounted for over 78% of all TDF-invested dollars as of 2020 and 2021, and that the Vanguard TDF was by far the most selected TDF with double the market share of the rest of the top 5 most selected TDFs.

**Figure 1**

**Exhibit 13** The 10 Largest Target-Date Providers

| | | **Assets** (USD in Billions) | | | **Market Share** | |
|---|---|---|---|---|---|---|
| Firm | Target-Date Series | Mutual Fund | CIT | Total TDF | 2021 | 2020 |
| **Vanguard** | | | | 1,190 | 36.4% | 36.7% |
| | Vanguard Target Retirement | 660 | 530 | | | |
| **Fidelity** | | | | 460 | 14.1% | 13.3% |
| | Fidelity Freedom | 221 | — | | | |
| | Fidelity Freedom Index | 106 | 46 | | | |
| | Fidelity Freedom Blend | 11 | 55 | | | |
| | Fidelity Advisory Freedom | 21 | — | | | |
| | Fidelity Flex Freedom Blend | <1 | — | | | |
| | Fideity Managed Retirement | <1 | — | | | |
| **T. Rowe Price** | | | | 374 | 11.5% | 11.6% |
| | T. Rowe Price Retirement | 180 | 170 | | | |
| | T. Rowe Price Target | 4 | 1 | | | |
| | T. Rowe Price Retirement Hybrid | — | 16 | | | |
| | T. Rowe Price Retirement Blend | <1 | 4 | | | |
| **BlackRock** | | | | 289 | 8.8% | 9.5% |
| | BlackRock LifePath Index | 61 | 226 | | | |
| | BlackRock LifePath Dynamic | 1 | 1 | | | |
| | BlackRock LifePath ESG Index | <1 | — | | | |
| **American Funds** | | | | 248 | 7.6% | 7.2% |
| | American Funds Target Date Retirement | 239 | 9 | | | |

## A. The Standard of Care for Prudent Fiduciaries Selecting, Retaining a Series with a Target-Date Strategy

40. ERISA's fiduciary duty of prudence requires that fiduciaries must act in accordance with the prudent investor standard when making decisions related to plan investments. This means that in order to be prudent, fiduciaries are required to follow accepted investment theories and prevailing investment industry practices. *Tibble*, 575 U.S. at 529-30. For the last several decades, the most accepted investment theory has been MPT, which has been incorporated into the prudent investor standard.

41. A prudent target-date strategy selection and monitoring process considers a wide array of metrics commonly accepted and incorporated in MPT that allow the fiduciary to properly assess the prudence of any potential TDF series.

42. A prudent process considers all the metrics and circumstances present at the time of the selection/retention/removal decision in order to evaluate whether the fund should be selected or retained.

43. Accordingly, the minimum standard of care for prudent plan fiduciaries selecting and retaining investment options to be made available for plan participants always requires an analysis of the risk-adjusted performance of the selected or retained investment options.

44. While the selection of a target date series is a bit more complex than the selection of a single-strategy investment option, retirement plan experts have also developed a minimum standard of care with respect to the selection and retention of target date series.

45. The most critical criteria for selecting and retaining target date fund series are performance, risk (which incorporates risk-adjusted performance), fees, and the "glide path" dynamic asset allocation (also sometimes called "portfolio construction"). These quantitative criteria are also supplemented with some qualitative criteria that are often merely proxies for an increased risk of future underperformance, *e.g.*, a change in the investment manager's ownership or key personnel, a shift in the investment manager's philosophy or process, or the investment manager's involvement in litigation or fraud allegations.[4]

[4] *See* Government Accountability Office, *GAO-24-105364, 401(k) Retirement Plans – The Department of Labor Should Update Guidance on Target Date Funds* (March 2024), p. 50; *See also* CAPTRUST's "Best Practices for Target Date Fund Selection; Callan Institute, Defined Contribution Trends Surveys 2017-2020, 2022.

46. And of course, the actual performance of an investment is the most important criteria to the investor (plan participant) and is accordingly always considered when evaluating a target date series. And because each target date series might incorporate a glide-path that takes on relatively more (or less) risk, the risk-adjusted performance metrics are relatively more important for comparing and benchmarking target date series.

47. As discussed above, when evaluating the risk-adjusted performance and quality of investment managers, the minimum standard of care for prudent plan fiduciaries incorporates standard metrics from MPT. The most important of these criteria include, but are not limited to, the following metrics over three- and five-year trailing periods:

- **Alpha:** A measure of the difference between a portfolio's actual returns and its expected performance, given its level of risk as measured by beta. A positive Alpha indicates the portfolio has performed better than its beta would predict. In contrast, a negative Alpha indicates the portfolio has underperformed, given the expectation established by beta.[5]
- **Sharpe Ratio:** A risk-adjusted returns measure developed by William Sharpe. The Sharpe Ratio is calculated over each time period by dividing a fund's annualized excess returns by the standard deviation of a fund's annualized excess returns to determine reward per unit of risk. The Sharpe Ratio can be used to compare two funds directly on how much risk each had to bear to earn

[5] *See* Government Accountability Office, *GAO-24-105364, 401(k) Retirement Plans – The Department of Labor Should Update Guidance on Target Date Funds* (March 2024), p. 70-1.

excess return over the risk-free rate.[6] Notably, American Century identifies the Sharpe Ratio as a meaningful investment metric in its marketing materials.[7]

- **Sortino Ratio:** Similar to the Sharpe ratio, the Sortino Ratio (developed by Frank Sortino) uses only the downside risk portion of the standard deviation in the denominator.[8]

48. Some other relevant metrics include the following:

- **Information ratio ("IR"):** a metric that helps the investor evaluate whether the manager of the investment is beating a specific benchmark. An IR above 1.0 is evidence of excellent performance with consistent outperformance of the specific benchmark; an IR between 0.5 and 0.99 is evidence of reasonable manager skill; an IR of below 0.5 is evidence of weak performance as compared to the specific benchmark; and a negative value IR is evidence of consistent underperformance relative to the benchmark.

- **Batting Average ("BA"):** is a measure of a manager's ability to consistently beat the market. It is calculated by dividing the number of months in which the manager beat or matched the fund's primary benchmark index by the total number of months in the period. For example, a manager who meets or outperforms the market every month in a given period would have a batting

---

[6] *See id.* at 71.

[7] *See* American Century Investments *One Choice Target Date Portfolios: An Intentionally Moderate Approach* ("Portfolios with higher Sharpe Ratios tend to provide more return for the same amount of risk as portfolios with lower Sharpe Ratios").

[8] Government Accountability Office, *GAO-24-105364, 401(k) Retirement Plans – The Department of Labor Should Update Guidance on Target Date Funds* (March 2024), p.71.

average of 1.000. A manager who beats the market half of the time would have a batting average of .500.

- **Turnover Ratio:** is the percentage of a mutual fund or other portfolio holdings that have been replaced in the course of one year. Since a fund with a higher turnover ratio will have higher trading fees and short-term capital gains taxes, a portfolio manager with a higher turnover ratio will need to ensure that those trades are generating positive returns in excess of the additional costs.

49. Additionally, the minimum standard of care for prudent plan fiduciaries selecting and retaining a TDF series requires a comparison of the risk-adjusted performance because no target date series will have an identical glidepath compared to its meaningful comparators.[9] In other words, to satisfy the minimum standard of care under the circumstances then prevailing both prior to and throughout the Class Period, a prudent fiduciary should have considered a comparison of the risk adjusted returns of available peer alternatives.[10]

50. Accordingly, a prudent plan fiduciary, when determining whether to retain a Target Date Fund series, would evaluate and compare the performance and commonly accepted investment performance metrics such as the ones identified above to meaningful benchmarks including at the very minimum the industry leading peer alternative target date options.

---

[9] *See* 29 C.F.R. §2550.404a-1 ("Investment Prudence Duties" shall include, but is not necessarily limited to "[a] determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties) or menu, to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action compared to the opportunity for gain (or other return) associated with reasonably available alternatives with similar risks.")

[10] *See*, the Target Date Benchmarking section of the Callan Institute, Defined Contribution Trends Surveys 2017-2020, 2022.

## VI. FACTUAL ALLEGATIONS

### A. Defendants Violated ERISA by Acting to Remove their Well-Performing Vanguard TDF and Replacing it with the underperforming AC TDF

#### 1. If Defendants followed a prudent process and compared the AC TDF to their previously held Vanguard TDF, they would have discovered that the AC TDF provided no advantages over the Vanguard TDF under most MPT metrics

51. Prior to—and throughout—the Class Period, Defendants had access to a tremendous amount of information to evaluate the performance of the Vanguard TDF series and conclude that it was performing well.

52. Prior to—and throughout—the Class Period, a prudent plan fiduciary, at a minimum, would have considered and compared the Vanguard TDF, by far the most selected TDF in the market harboring over a third of the market share, to its proposed replacement, the AC TDF. This comparison would have revealed what Defendants should have known from their own monitoring reports from 2017-2020: that the Vanguard TDF was performing well, and that their existing selection consistently outperformed other funds—including the AC TDF—under accepted MPT metrics.

53. The Vanguard TDF was performing phenomenally and remained the most selected TDF by fiduciaries throughout the class period.

54. It is patently imprudent to remove and replace one TDF with another TDF that offers no measurable advantage under most metrics.

55. Nonetheless, Defendants decided to remove the Vanguard TDF in 2021 in favor of the AC TDF, a fund which overall provided no measurable advantages over the Vanguard TDF. This decision was completely unsupported by a prudent MPT data approach, as discussed in the following paragraphs.

56. All available data, under the circumstances then prevailing when this decision was made, indicated that the Vanguard TDF series demonstrably **performed better under the majority of MPT metrics at all measurable times** from 2017 through 2020 relative to the AC TDF.

57. Defendants' disregard of quantifiable metric performance, such as returns, risk adjusted returns, manager metrics, and costs in making this decision was patently imprudent.

58. Specifically, the information available to the Fiduciaries in 2021 was 3-and 5-year lookback performance.

59. For several years prior to, and continuing throughout, the Class Period, the Vanguard TDF materially outperformed[11] the AC TDF.

60. Under the circumstances prevailing in 2021, when confronted with the 2017, 2018, 2019, and 2020 information that the Vanguard TDF had performed well in 3- and 5-year returns as well as risk-adjusted returns, manager metrics, and cost metrics, a prudent fiduciary—following the standard of care for prudent investors—would **not** have decided to remove the Vanguard TDF in 2021, and especially not in favor of a dramatically underperforming AC TDF.

61. **Figure 2** below provides a summary of the AC TDF series' 3- and 5-year investment returns and metrics underperformance compared to the Vanguard TDF series in 2017, 2018, 2019 and 2020. Over those four years preceding the 2021 selection year, available data showed that the AC TDF underperformed the Vanguard TDF in 3- and 5-year lookback metrics in 77% of time periods of available data measured. The AC TDF series therefore had consistently underperformed the Vanguard TDF series for four years by the end of 2021.

[11] Under returns and MPT metrics.

**Figure 2**

**Performance Metrics Comparison Summary January 2017 - December 2020**

| Metric Analyzed | Total # of Metrics Analyzed Against Comparators | # of Metrics Underperformed | Percentage of Metrics Underperformed |
|---|---|---|---|
| 3 - Year Return | 27 | 23 | 85% |
| 5 - Year Return | 24 | 23 | 96% |
| Sharpe Ratio - 3 - Year | 27 | 20 | 74% |
| Sharpe Ratio - 5 - Year | 24 | 9 | 38% |
| Information Ratio 3 - Year | 27 | 26 | 96% |
| Information Ratio 5 - Year | 24 | 24 | 100% |
| Alpha 3 - Year | 27 | 20 | 74% |
| Alpha 5 - Year | 24 | 10 | 42% |
| Sortino Ratio - 3 - Year | 27 | 19 | 70% |
| Sortino Ratio - 5 - Year | 24 | 10 | 42% |
| Batting Average 3 - Year | 27 | 23 | 85% |
| Batting Average 5 - Year | 24 | 23 | 96% |
| Turnover Ratio | 28 | 27 | 96% |
| **Total** | **334** | **257** | **77%** |

62. The AC TDF underperformed the Vanguard TDF in 257 out of 334 (77%) of time periods for each metric[12] examining 3- and 5-year lookbacks. Given this information, a prudent fiduciary would have had no reason to expect the AC TDF to outperform the Vanguard TDF investment in the future. Unsurprisingly, the decision to remove the Vanguard TDF series in 2021 to replace it with the inferior AC TDF series based on this information resulted in millions of dollars of harm to the Plan.

63. A prudent fiduciary following the standard of care under the circumstances then prevailing in 2021 (including the examination of 2017 through 2020 3- and 5-year lookback data)

[12] Each Representing the total number of available data points for each metric analyzed from January 2017 through December 2020.

would have evaluated the AC TDF series against their current TDF under the MPT accepted investment metrics described in this Complaint.

64. Regardless of which combination of reasonable metrics was chosen, a fiduciary acting under the prudent investor standard under the circumstances then prevailing in 2021 **could not have concluded that it was prudent to remove the Vanguard TDF series and replace it with the AC TDF series** unless they employed a flawed process.

65. The vast majority of data available in 2021 counseled against Defendants' decision to remove the Vanguard TDF and replace it with the AC TDF.

66. Prudent fiduciaries confronted with this reality would have continued to retain the Vanguard TDF instead. A prudent process would have revealed that there was no need for any action.

67. **Appendix A** to this Complaint further provides the same charts demonstrating underperformance of AC TDFs in comparison with the Vanguard TDFs across the 2030-2060 vintages.

68. Any fiduciary following a prudent process would have reviewed these metrics, which clearly show that replacing the Vanguard TDF with the AC TDF was imprudent. No reasonably prudent fiduciary reviewing the readily available information at the time this decision was made in 2021 could have justified replacing the Vanguard TDF with the AC TDF.

69. Defendants' decision to replace the Vanguard TDF with the AC TDF and to then retain the AC TDF—even in the face of overwhelming evidence of AC TDF's underperformance—demonstrates a profound breakdown in their fiduciary process. The data was not even close.

70. As a direct result of this conduct, the Plan participants have suffered investment losses of millions of dollars.

71. If the choice was between Vanguard TDF and AC TDF, a prudent process would have supported continued retention of the Vanguard TDF and avoided the harm to the Plan.

**i. Vintage-to-Vintage Comparison**

72. As outlined above, a prudent fiduciary examining both the Vanguard TDF ***series*** and AC TDF ***series*** in 2021 (under the circumstances then prevailing) would not have removed the Vanguard TDF and replaced it with the AC TDF, considering the dramatic level of AC TDF's underperformance on a series-to-series basis.

73. The results of the series-level comparisons make clear that conducting a vintage-to-vintage comparison would have also revealed the same significant underperformance.

74. Unsurprisingly, the vintage-to-vintage comparison likewise would have illustrated to the Fiduciaries that the AC TDF's performance was inferior to the Vanguard TDF under the circumstances then prevailing in 2021 (2017, 2018, 2019 and 2020 data).

75. Almost every single AC TDF vintage underperformed the corresponding Vanguard TDF vintage when evaluated by the commonly accepted MPT metrics (Sharpe, Sortino, Alpha, etc.).

76. **Appendix A** sets forth the comparison of every vintage of the AC TDF series to the same vintage for the formerly held Vanguard TDF series.

77. For each vintage, the tables in **Appendix A** provide the investment metrics identified throughout this Complaint for the years preceding the selection period, which was the most up to date and relevant data available to the fiduciaries when the AC TDF was selected in 2021. If the AC TDF series vintage underperformed Vanguard TDF, then the metric is highlighted in red. If the AC TDF series vintage outperformed Vanguard TDF, the metric is highlighted in

green, and ties are left white. When data is not available the space is left blank. The 2030 vintage comparison of AC TDF to Vanguard TDF from **Appendix A** is set forth below as **Figure 3**.

**Figure 3**

American Century One Choice 2030 R6

| ARCUX | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| 3 - Year Return | 6.26% | 4.82% | 8.68% | 8.47% |
| 5 - Year Return | 8.44% | 4.16% | 6.25% | 9.15% |
| Sharpe Ratio - 3 - Year | 0.953 | 0.580 | 0.993 | 0.642 |
| Sharpe Ratio - 5 - Year | 1.320 | 0.543 | 0.743 | 0.867 |
| Information Ratio 3 - Year | -0.677 | -0.929 | -1.085 | -0.280 |
| Information Ratio 5 - Year | -0.577 | -0.160 | -0.611 | -0.698 |
| Alpha 3 - Year | 0.04% | -0.71% | -0.43% | 0.27% |
| Alpha 5 - Year | 0.60% | 0.27% | -0.15% | -0.14% |
| Sortino Ratio - 3 - Year | 1.619 | 0.803 | 1.482 | 0.968 |
| Sortino Ratio - 5 - Year | 2.411 | 0.798 | 1.148 | 1.331 |
| Batting Average 3 - Year | 0.472 | 0.417 | 0.417 | 0.528 |
| Batting Average 5 - Year | 0.450 | 0.517 | 0.483 | 0.450 |
| Turnover Ratio | 14.00 | 16.00 | 20.00 | 27.00 |

78. **Figure 4**, below, provides the same investment metrics from the Vanguard TDF vantage point. As above, if the comparable Vanguard TDF vintage outperformed the AC TDF vintage, then the metric is highlighted in green. If the Vanguard TDF vintage underperformed the AC TDF it is highlighted in red and ties are left white. The 2030 vintage Vanguard TDF comparison to AC TDF from **Appendix A** is set forth below.

**Figure 4**

**Vanguard Target Retirement 2030 Fund**

| VTHRX | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| 3 - Year Return | 7.85% | 6.07% | 10.24% | 9.16% |
| 5 - Year Return | 10.13% | 4.82% | 7.41% | 10.51% |
| Sharpe Ratio - 3 - Year | 1.006 | 0.668 | 1.054 | 0.622 |
| Sharpe Ratio - 5 - Year | 1.331 | 0.555 | 0.778 | 0.882 |
| Information Ratio 3 - Year | 0.270 | -0.188 | 0.266 | 0.059 |
| Information Ratio 5 - Year | 0.580 | 0.392 | 0.134 | -0.062 |
| Alpha 3 - Year | 0.38% | -0.18% | -0.02% | 0.05% |
| Alpha 5 - Year | 0.72% | 0.38% | 0.08% | -0.03% |
| Sortino Ratio - 3 - Year | 1.737 | 0.939 | 1.566 | 0.941 |
| Sortino Ratio - 5 - Year | 2.467 | 0.823 | 1.209 | 1.360 |
| Batting Average 3 - Year | 0.639 | 0.556 | 0.556 | 0.528 |
| Batting Average 5 - Year | 0.650 | 0.600 | 0.583 | 0.550 |
| Turnover Ratio | 7.53 | 9.00 | 8.00 | 21.00 |

79. **Figure 5** provides the difference in performance from the AC TDF vantage point. If the difference is in favor of AC TDF it is highlighted in green. If the difference is in favor of the Vanguard TDF it is highlighted in red.

**Figure 5**

**American Century One Choice 2030 R6 & Vanguard Target Retirement 2030 Fund Comparison**

| | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| 3 - Year Return | 1.59% | 1.25% | 1.55% | 0.69% |
| 5 - Year Return | 1.69% | 0.67% | 1.16% | 1.36% |
| Sharpe Ratio - 3 - Year | 0.052 | 0.088 | 0.061 | -0.019 |
| Sharpe Ratio - 5 - Year | 0.011 | 0.013 | 0.035 | 0.015 |
| Information Ratio 3 - Year | 0.947 | 0.740 | 1.351 | 0.339 |
| Information Ratio 5 - Year | 1.157 | 0.552 | 0.746 | 0.636 |
| Alpha 3 - Year | 0.34% | 0.54% | 0.40% | -0.23% |
| Alpha 5 - Year | 0.12% | 0.11% | 0.23% | 0.11% |
| Sortino Ratio - 3 - Year | 0.118 | 0.136 | 0.084 | -0.027 |
| Sortino Ratio - 5 - Year | 0.057 | 0.025 | 0.061 | 0.028 |
| Batting Average 3 - Year | 0.167 | 0.139 | 0.139 | 0.000 |
| Batting Average 5 - Year | 0.200 | 0.083 | 0.100 | 0.100 |
| Turnover Ratio | -6.47 | -7.00 | -12.00 | -6.00 |
| # of Underperforming Metrics | 13 | 13 | 13 | 9 |
| # of Total Metrics | 13 | 13 | 13 | 13 |
| % of Underperforming Metrics | **100%** | **100%** | **100%** | **69%** |

80. As the 2030 comparison examples demonstrate, AC TDF vintage underperformed the Vanguard TDF vintage in almost all metrics in 5- and 3-year lookbacks in 2017, 2018, 2019, and 2020 which represents all the data available to the Fiduciaries in 2021.

**2. AC TDF also dramatically underperformed three of the additional largest TDFs available on the market, any of which would have been a more prudent selection than the AC TDF**

81. In addition, Defendants also had access to a large quantity of data showing that the AC TDF dramatically underperformed three additional of the top industry leading TDFs, which Plan Fiduciaries could have reviewed and chosen instead of the AC TDF in 2021.

82. Prior to—and throughout—the Class Period, a prudent plan fiduciary would also have considered and compared its chosen replacement (the AC TDF) to other industry leading funds. This comparison would have revealed that the AC TDF consistently and dramatically underperformed three additional industry leading competitors under almost all MPT metrics for the period of 2017-2020.

83. Nonetheless, Defendants decided in 2021 to select the AC TDF, a fund which overall provided no measurable advantages over other available funds. This decision was completely unsupported by a prudent MPT data approach, as discussed in the following paragraphs.

84. All available data under the circumstances then prevailing when this decision was made indicated that an additional three of the largest TDF series on the market performed **demonstrably better under MPT metrics** from 2017 through 2020 relative to the AC TDF.

85. As with the decision to remove the Vanguard TDF, the Defendants' disregard of quantifiable metric performance, such as returns, risk adjusted returns, manager metrics, and costs in making this decision was patently imprudent and implicates a lack of prudent process.

86. **Figure 6** below provides a summary of AC TDF's 3- and 5-year investment returns and metrics underperformance compared to industry leading available alternative target date series (described in more detail below) from 2017 through the end of 2020. Over those four years, available data showed that AC TDF underperformed in 3- and 5-year lookback metrics against the industry leading TDFs in 84% of time periods of available data measured. The AC TDF therefore consistently underperformed for four years by the end of 2020 across all metrics.

**Figure 6**

**Performance Metrics Comparison Summary January 2017 - December 2020**

| Metric Analyzed | Total # of Metrics Analyzed Against Comparators | # of Metrics Underperformed | Percentage of Metrics Underperformed |
|---|---|---|---|
| 3 - Year Return | 107 | 99 | 93% |
| 5 - Year Return | 90 | 89 | 99% |
| Sharpe Ratio - 3 - Year | 107 | 83 | 78% |
| Sharpe Ratio - 5 - Year | 90 | 57 | 63% |
| Information Ratio 3 - Year | 107 | 106 | 99% |
| Information Ratio 5 - Year | 90 | 90 | 100% |
| Alpha 3 - Year | 107 | 88 | 82% |
| Alpha 5 - Year | 90 | 58 | 64% |
| Sortino Ratio - 3 - Year | 107 | 86 | 80% |
| Sortino Ratio - 5 - Year | 90 | 58 | 64% |
| Batting Average 3 - Year | 107 | 95 | 89% |
| Batting Average 5 - Year | 90 | 86 | 96% |
| Turnover Ratio | 112 | 89 | 79% |
| **Total** | **1,294** | **1,084** | **84%** |

87. The AC TDF underperformed in 1,084 out of 1,294 (84%) of time periods for each metric[13] examining 3- and 5-year lookbacks. Given this information, a prudent fiduciary would have had no reason to expect the AC TDF to outperform any of the industry leading TDFs in the

[13] Each Representing the total number of available data points for each metric analyzed from January 2017 through December 2020.

future. Unsurprisingly, the decision to ignore this mountain of data and instead select the underperforming AC TDF series resulted in millions of dollars of harm to the Plan.

88. If it had been beneficial to the Plan to replace the Vanguard TDF, prudent fiduciaries had ample opportunities to choose an established, prudent alternative over the underperforming AC TDF.

**i. Vintage-to-Vintage Comparison**

89. **Appendix B** provides the same style charts demonstrating the overall underperformance of the AC TDF series in comparison with industry leading TDFs across the 2030-2060 vintages.

90. As with the Vanguard TDF comparison, for each AC TDF vintage, the tables in **Appendix B** provide investment metrics identified throughout this Complaint for the years preceding the selection period, which was the most up to date and relevant data available to the fiduciaries when the AC TDF was selected in 2021. For example, **Figures 7-9** contain the AC TDF 2030 vintage compared with industry leading American Funds 2030 Target Date Retire (the "AF TDF") vintage. If the AC TDF vintage underperformed AF TDF's corresponding vintage, then the metric is highlighted in red. If the AC TDF vintage outperformed AF TDF's corresponding vintage, the metric is highlighted in green, and ties are left white. When data is not available the space is left blank. The 2030 vintage comparison of AC TDF to AF TDF from **Appendix B** is set forth below in **Figure 7**.

**Figure 7**

**American Century One Choice 2030 R6**

| ARCUX | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| 3 - Year Return | 6.26% | 4.82% | 8.68% | 8.47% |
| 5 - Year Return | 8.44% | 4.16% | 6.25% | 9.15% |
| Sharpe Ratio - 3 - Year | 0.953 | 0.580 | 0.993 | 0.642 |
| Sharpe Ratio - 5 - Year | 1.320 | 0.543 | 0.743 | 0.867 |
| Information Ratio 3 - Year | -0.677 | -0.929 | -1.085 | -0.280 |
| Information Ratio 5 - Year | -0.577 | -0.160 | -0.611 | -0.698 |
| Alpha 3 - Year | 0.04% | -0.71% | -0.43% | 0.27% |
| Alpha 5 - Year | 0.60% | 0.27% | -0.15% | -0.14% |
| Sortino Ratio - 3 - Year | 1.619 | 0.803 | 1.482 | 0.968 |
| Sortino Ratio - 5 - Year | 2.411 | 0.798 | 1.148 | 1.331 |
| Batting Average 3 - Year | 0.472 | 0.417 | 0.417 | 0.528 |
| Batting Average 5 - Year | 0.450 | 0.517 | 0.483 | 0.450 |
| Turnover Ratio | 14.00 | 16.00 | 20.00 | 27.00 |

91. **Figure 8**, below, provides the same investment metrics from the AF TDF vantage point. As above, if the comparable AF TDF vintage outperformed the AC TDF vintage, then the metric is highlighted in green. If the AF TDF vintage underperformed the AC TDF it is highlighted in red and ties are left white.

**Figure 8**

**American Funds 2030 Trgt Date Retire R6**

| RFETX | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| 3 - Year Return | 8.61% | 6.92% | 10.86% | 9.84% |
| 5 - Year Return | 11.50% | 5.63% | 8.07% | 11.06% |
| Sharpe Ratio - 3 - Year | 1.064 | 0.777 | 1.157 | 0.711 |
| Sharpe Ratio - 5 - Year | 1.425 | 0.639 | 0.853 | 0.981 |
| Information Ratio 3 - Year | 0.698 | 0.443 | 0.517 | 0.333 |
| Information Ratio 5 - Year | 1.196 | 0.757 | 0.501 | 0.244 |
| Alpha 3 - Year | 0.89% | 0.70% | 0.89% | 1.18% |
| Alpha 5 - Year | 1.59% | 1.10% | 0.77% | 1.04% |
| Sortino Ratio - 3 - Year | 1.846 | 1.135 | 1.766 | 1.135 |
| Sortino Ratio - 5 - Year | 2.739 | 0.987 | 1.352 | 1.593 |
| Batting Average 3 - Year | 0.556 | 0.611 | 0.611 | 0.556 |
| Batting Average 5 - Year | 0.617 | 0.617 | 0.583 | 0.533 |
| Turnover Ratio | 0.00 | 8.00 | 0.00 | 8.00 |

92. **Figure 9** provides the difference in performance from the AC TDF vantage point. If the difference is in favor of AC TDF it is highlighted in green. If the difference is in favor of the AF TDF it is highlighted in red.

**Figure 9**

American Century One Choice 2030 R6 & American Funds 2030 Trgt Date Retire R6 Comparison

| | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|
| 3 - Year Return | 2.36% | 2.10% | 2.18% | 1.37% |
| 5 - Year Return | 3.07% | 1.47% | 1.82% | 1.91% |
| Sharpe Ratio - 3 - Year | 0.110 | 0.197 | 0.164 | 0.070 |
| Sharpe Ratio - 5 - Year | 0.105 | 0.096 | 0.110 | 0.113 |
| Information Ratio 3 - Year | 1.375 | 1.371 | 1.601 | 0.613 |
| Information Ratio 5 - Year | 1.773 | 0.917 | 1.112 | 0.942 |
| Alpha 3 - Year | 0.85% | 1.41% | 1.32% | 0.91% |
| Alpha 5 - Year | 0.99% | 0.83% | 0.91% | 1.18% |
| Sortino Ratio - 3 - Year | 0.227 | 0.332 | 0.285 | 0.167 |
| Sortino Ratio - 5 - Year | 0.328 | 0.189 | 0.204 | 0.261 |
| Batting Average 3 - Year | 0.083 | 0.194 | 0.194 | 0.028 |
| Batting Average 5 - Year | 0.167 | 0.100 | 0.100 | 0.083 |
| Turnover Ratio | -14.00 | -8.00 | -20.00 | -19.00 |
| # of Underperforming Metrics | 13 | 13 | 13 | 13 |
| # of Total Metrics | 13 | 13 | 13 | 13 |
| % of Underperforming Metrics | **100%** | **100%** | **100%** | **100%** |

93. As the 2030 comparison examples demonstrate, the AC TDF vintage underperformed the AF TDF vintage in 100% of time periods for four straight years under every metric in 5- and 3-year lookbacks which represents all the data available to the Fiduciaries in 2021.

94. Defendants' decision to choose the AC TDF—even in the face of overwhelming evidence of AC TDF's underperformance of a slate of superior alternatives, including the formerly held Vanguard TDF and the widely available AF TDF—further demonstrates a profound breakdown in their fiduciary process.

95. As a direct result of this conduct, the Plan participants have suffered investment losses of millions of dollars.

## VII. CLASS ACTION ALLEGATIONS

96. Plaintiff brings this action on behalf of Plaintiff and the Class, which is defined as participants in and beneficiaries of the Plan but excluding Defendants and their immediate family members.

97. The Class Period includes the six years prior to the date of the filing of this Complaint through the date of judgment.

98. The members of the Class are so numerous, consisting of thousands of members, not including their spouse beneficiaries, who, upon information and belief, are sufficiently dispersed geographically such that joinder of all members is impracticable. The issues of liability are common to all members of the Class and are suitable to common resolution.

99. Plaintiff's claims are typical of the claims of other members of the Class because the claims arise from the same events, practices and/or courses of conduct described above.

100. Plaintiff's claims are also typical of the claims of other members of the Class because the relief sought consists of requiring Defendants to make the Plan whole for any losses caused by their fiduciary breaches and to disgorge their profits to the Plan. Any such recovery from Defendants will be paid to the Plan and any relief will flow to all Class Members through their accounts in the Plan.

101. Plaintiff will fairly and adequately represent and protect the interests of the Class.

102. Plaintiff does not have any interests antagonistic to or in conflict with those of the Class.

103. Defendants have no unique defenses against Plaintiff that would interfere with Plaintiff' representation of the Class.

104. Plaintiff is represented by counsel experienced in prosecuting ERISA class actions and with particular experience and expertise in litigation involving ERISA breaches of fiduciary duty.

105. The requirements of Fed. R. Civ. P. 23(b)(1)(A) are satisfied. Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to act in the best interests of the Plan and its participants. This action challenges whether Defendants acted consistently with their obligations under ERISA as to the Plan as a whole. As a result, prosecution of separate actions by individual members would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct relating to the Plan.

106. The requirements of Fed. R. Civ. P. 23(b)(1)(B) are also satisfied. Administration of an ERISA-covered plan requires that all similarly situated participants be treated the same. Resolving whether Defendants fulfilled their fiduciary obligations to the Plan would, as a practical matter, be dispositive of the interests of the other participants in the Plan even if they are not parties to this litigation and would substantially impair or impede their ability to protect their interests if they are not made parties to this litigation by being included in the Class.

107. The requirements of Fed. R. Civ. P. 23(b)(2) are satisfied as to the Class because Defendants have acted and/or failed to act on grounds generally applicable to the Class, making declaratory and injunctive relief appropriate with respect to the Class as a whole. This action challenges whether Defendants breached their fiduciary duties, which would be violations of ERISA as to the Plan as a whole and as to the Class as a whole. The relief sought in this case primarily consists of declarations that Defendants breached their fiduciary duties. As ERISA is

based on trust law, any monetary relief consists of equitable monetary relief that would either flow directly from the declaratory or injunctive relief or flow as a necessary consequence of that relief.

108. The requirements of Fed. R. Civ. P. 23(b)(3) are also satisfied. The common questions of law and fact concern whether Defendants breached their fiduciary duties to the Plan. As the members of the Class were participants in that Plan, their accounts were affected by those breaches and violations. Common questions related to liability will necessarily predominate over any individual questions precisely because Defendants' duties and obligations were uniform to all participants and therefore all members of the Class. As relief and any recovery will be on behalf of the Plan, common questions as to remedies and damages will likewise predominate over any individual issues.

109. A class action is a superior method to other available methods for the fair and efficient adjudication of this action. As the claims generally are brought on behalf of the Plan, resolution of the issues in this litigation will be efficiently resolved in a single proceeding rather than multiple proceedings and each of those individual proceedings could seek recovery for the entire Plan. Class certification is a superior method of proceeding because it will obviate the need for unduly duplicative litigation which might result in inconsistent judgments about Defendants' duties with regard to the Plan.

110. Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VII. PLAN-WIDE RELIEF

111. ERISA authorizes any participant or beneficiary of the Plan to bring an action on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a). See 29 U.S.C. § 1132(a)(2).

112. Indeed, ERISA breach-of-fiduciary duty actions generally hinge on the uniform conduct of plan fiduciaries with respect to the plan. *Hughes v. Nw. Univ.*, 595 U.S. 170, 176-77 (2022).

113. Plaintiff here seeks relief on behalf of the Plan, i.e., in this case for all losses to the Plan caused by Defendants' breaches, and not only the losses to Plaintiff' individual account.

**VIII. TIMELINESS**

114. Within the six-year period prior to Plaintiff filing this suit, Defendants violated one or more of their fiduciary obligations as described above.

115. Plaintiff did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed. Consequently, Plaintiff' claims in this action are timely under 29 U.S.C. § 1113.

**COUNT I: Breach of Fiduciary Duty of Prudence**
**(Against All Defendants)**

116. Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

117. At all relevant times, the Defendants were named and/or de facto fiduciaries of the Plan within the meaning of ERISA insofar as they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets. 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

118. ERISA mandates that fiduciaries act with prudence in the disposition of Plan assets and selection and monitoring of investments. 29 U.S.C. § 1104(a)(1)(B).

119. During the Class Period, Defendants had a fiduciary duty to do all of the following: manage the assets of the Plan prudently and act with the care, skill, diligence, and prudence required by ERISA.

120. At all relevant times during the Class Period, Defendants breached their fiduciary duties of prudence in multiple respects by removing the well-performing Vanguard TDF series and selecting and retaining the AC TDF that provided no advantages and underperformed under Vanguard TDF under all MPT metrics.

121. The fact that Defendants removed the Vanguard TDF in favor of options that underperformed under all metrics and provided no measurable advantage, raises an inference of imprudent process.

122. Defendants were directly responsible for: evaluating and monitoring the Plan's investment options, including the Vanguard TDF series and AC TDF series, in a prudent fashion; retaining well-performing funds, like Vanguard TDF, and not to replace them with demonstrably worse performing funds, such as the AC TDF.

123. Defendants failed to employ a prudent fiduciary process by failing to monitor and evaluate their TDF options in comparison to other meaningful benchmark TDFs prior to and after selection.

124. Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise

of like character and with like aims, thereby breaching their fiduciary duties of prudence under 29 U.S.C. § 1104(a)(1)(B).

125. As a result of the Defendants' breach of their fiduciary duty of prudence with respect to the Plan, the Plaintiff and Plan participants suffered millions of dollars in unreasonable and unnecessary monetary losses.

126. Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the fiduciary breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breach of fiduciary duty alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2).

**COUNT II: Failure to Adequately Monitor Other Fiduciaries under ERISA (against the Company)**

127. Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

128. The Company had the authority to appoint and remove members or individuals responsible for Plan investment management and was aware that these fiduciaries had critical responsibilities for the Plan.

129. In light of this authority, the Company had a duty to monitor those individuals responsible for Plan investment management to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

130. The Company had a duty to ensure that the individuals responsible for Plan investment management possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial

resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Company.

131. The Company breached its duty to monitor individuals responsible for Plan investment management, by, among other things:

a. Failing to monitor and evaluate the performance of individuals responsible for Plan investment management or have a system in place for doing so, standing idly by as the Plan suffered significant losses by imprudently switching from well-performing Vanguard TDF to the demonstrably worse AC TDF during the Class Period;

b. Failing to monitor the process by which Plan TDFs were evaluated, failing to investigate the suitability of the AC TDF based on failing to investigate the availability of alternative, prudent TDFs; and

c. Failing to remove individuals responsible for Plan investment management whose performance was inadequate in that they selected replacement of a well-performing Vanguard TDF for the demonstrably worse AC TDF, then continued to maintain the worse-performing AC TDF, all to the detriment of the Plan and Plan participants' retirement savings.

132. As a result of the foregoing breaches of the duty to monitor, the Plaintiff and Plan participants suffered unreasonable and unnecessary monetary losses amounting to millions of dollars.

133. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor individuals responsible for Plan

investment management. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## IX. PRAYER FOR RELIEF

Wherefore Plaintiff prays that judgment be entered against Defendants on all claims, and requests that the Court order or award the following relief:

A. Certify this action as a class action pursuant to Fed. R. Civ. P. 23, appoint the Plaintiff as class representative, and appoint the firm Milberg, PLLC as class counsel;

B. Order Defendants to disgorge any profits they received as a result of the above breaches of fiduciary duty;

C. Impose a constructive trust over these profits;

D. Impose a monetary surcharge against Defendants and compel Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from imprudent investment of the Plan's assets in the AC TDF, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Plan participants would have made if the Defendants had fulfilled their fiduciary obligations by undertaking TDF suitability and comparative analyses on a timely basis;

E. Apportion all amounts recovered for the Plan among the Plaintiff and the Class;

F. Order that any amount to be paid to the Plan and/or accounts of Plaintiff and Class members can be satisfied by using or transferring any breaching fiduciary's account (or the proceeds of that account) to the extent of that fiduciary's liability;

G. Require Defendants to pay attorneys' fees and the costs of this action pursuant to 29 U.S.C. § 1132(g)(1), or order the payment of reasonable fees and expenses to Plaintiff' counsel on

the basis of the common benefit or common fund doctrine (or other applicable law) out of any money or benefit recovered for the Class in this action;

H. Award pre-judgment and post-judgment interest;

I. Award any other such relief the Court determines Plaintiff and the Class are entitled to pursuant to 29 U.S.C. § 1132(a);

J. Award such other relief as the Court may deem just and proper;

DATED: June 29, 2026

Respectfully submitted,

*Daniel K. Natirboff*
Daniel K. Natirboff, Esquire
Attorney I.D. No.: 78594
**CAPOZZI ADLER, P.C.**
2933 North Front Street
Harrisburg, PA 17110
(717) 233-4101
Email: Dann@capozziadler.com

Alexandr Rudenco*
**MILBERG, PLLC**
800 S. Gay St., Suite 1100
Knoxville, TN 37929
Tel: (865) 247-0080
Email: arudenco@milberg.com
acody@milberg.com

Mark K. Gyandoh, Esquire*
James A. Maro, Esquire*
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
Tel: (610) 890-0200
Email: markg@capozziadler.com
jamesm@capozziadler.com

**Pro Hac Vice Application Forthcoming*

*Counsel for Plaintiff and the Prospective Class*